IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

BETH A NORTON,

    Plaintiff,

v.

UNUM LIFE INSURANCE
COMPANY OF AMERICA

    Defendant.

Civil Action No. 3:22cv614

## COMPLAINT

COMES NOW the Plaintiff, BETH A. NORTON ("Plaintiff" or "Ms. Norton"), by counsel, and alleges:

### JURISDICTION AND VENUE

1. This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. § 1001, et seq., and is brought to obtain relief under Section 502(a)(1)(B) and 502(a)(3) of ERISA, 29 U.S.C. § 1132.

2. This Court has subject matter jurisdiction over this action pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1).

3. Venue with respect to this action lies with the Richmond Division, pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because the Plan at issue was administered in Glen Allen, which is closest to the Richmond Division of the Eastern District Court of the United States.

4. The UNUM insurance plan ("the Plan") at issue in this case is an employee benefit plan within the meaning of Section 3(3) of ERISA, 29 U.S.C. §1002(3),

1

and is, therefore, subject to coverage of the Act pursuant to Section 4(a) of ERISA, 29 U.S.C. §1003(a).

## FACTS

1. In or around 2006, Ms. Norton injured her neck while lifting a patient in her position as a cardiac nurse.

2. Over the next two years, Ms. Norton experienced progressive neck pain, which led her to seek treatment, and in 2008, Ms. Norton was diagnosed with cervical spinal stenosis and scoliosis.

3. Her treating providers told her that, due to her cervical spinal condition, she should no longer lift patients, which meant that she could no longer work as a floor nurse in a hospital.

4. As a result of this limitation, Ms. Norton decided to pursue a career as a healthcare attorney, enrolling in the health law program at the University of Virginia School of Law in 2011.

5. While preparing for and attending law school, Ms. Norton discovered that sitting for long periods of time caused her significant back and neck pain, so she was treated by Dr. Wayne Fusco ("Dr. Fusco") from 2012 until June 2014, when she moved back to Norfolk to start work as a healthcare associate at Kaufman & Canoles, P.C.

6. According to his records, Dr. Fusco acknowledged that Ms. Norton's symptoms, particularly her severe pain, were made worse by sitting, reading, driving, writing, and typing. He also noted that stretching was palliative, but temporary.

7. She continued to receive chiropractic care in Norfolk with Dr. Scott Niblo. On October 17, 2016, Ms. Norton had an MRI that was ordered by Dr. Niblo and which demonstrated diffuse cervical disc (C5-6) bulging, narrowing of the neural foramina, C6-7 joint hypertrophy, and moderate narrowing of the left neural foramina.

8. In 2017, Ms. Norton married her husband David, who lived in Charlottesville. She moved to Charlottesville that year but was unable to find employment as a healthcare attorney there, despite exhaustive efforts. Therefore, she accepted a position as a healthcare associate with the law firm Hancock, Daniel & Johnson in Glen Allen ("HDJ"), which was 1.25 hours away from Ms. Norton's home. The Unum Plan, including both short-term and long-term disability benefits, was included among the benefits offered to Ms. Norton by HDJ.

9. In or around March 2018, Ms. Norton found that her pain had become intolerable, so she asked her HDJ supervising attorney, Mary Malone, if she could work from home two days a week to minimize driving time and to permit her the breaks she needed throughout the day to stretch and engage in other therapeutic treatments. The request was granted.

10. Around the end of 2018 or beginning of 2019, her supervisor told her she would have to return to working in the office in Glen Allen five days a week because some of the other employees and managers were complaining that Ms. Norton was receiving preferential treatment. Ms. Norton expressed her

concern that her neck condition and symptoms remained severe, but she was given no choice.

11. Her pain and symptoms rapidly worsened.

12. By mid-March 2019, Ms. Norton was in severe pain from the time she woke up in the morning until she went to bed each night. Each day the pain got worse and began to manifest in new neurological symptoms, including but not limited to, intense, daily headaches; pain that shot down through her left shoulder, down her arm, and into to her hand; weakness in her left hand; tremors; intense burning in her head, neck and down her entire spine; intense middle back stiffness; chest pain; and lower back and hip pain that radiated down her legs.

13. Many of these symptoms she had never experienced before, and the pain was far more intense than she had ever experienced. As a result of the deterioration of her condition, she also became extremely depressed and even had suicidal thoughts.

14. On April 1, 2019, Ms. Norton saw her chiropractor, Dr. Scott Wagner, who told her she needed to take time off to rehabilitate, and that she could not drive to Glen Allen daily anymore.

15. Based on her chiropractor's recommendations and after discussing the issue with her family, on or around April 2, 2019, Ms. Norton resigned from HDJ due to her worsening condition and the limitations they presented.

16. When she resigned, she was not given the option of working part-time or from home, but she told her manager she would complete her open projects over the next few weeks from home.

17. Ms. Norton continued to experience severe pain and neurological symptoms as she worked at her computer from home. In fact, the only time she was out of severe pain was when she was lying flat on the floor on her yoga mat. Within minutes of working at the computer, her extreme symptoms returned. She did manage to work 2 or 3 hours a day during this time and completed all her HDJ projects to her supervisor's satisfaction.

18. Ms. Norton's last day of work with HDJ was April 21, 2019.

19. On April 22, 2019, Ms. Norton saw her primary care physician, Dr. Mark Lepsch ("Dr. Lepsch") at his office where he ordered standing x-rays of her cervical spine, which demonstrated: sigmoid scoliosis, extensive discogenic disease at C5-6 and C6-7, mild discogenic disease at C4-5 and C7-T1, mild retrolisthesis at C5-6 C6-7, osteoarthritis at all levels, reversal of curvature, and neural foraminal stenosis at C5-6 C6-7. The study's overall "Impression" was: "Discogenic disease and osteoarthritis."

20. This was the first time Ms. Norton had been diagnosed with discogenic disease at levels C7-T1, retrolisthesis, and osteoarthritis at all levels. The x-rays also demonstrated neural foraminal stenosis, which Dr. Lepsch told her explained the worsening neurological symptoms she was having, particularly the pain, numbness and tingling she was experiencing in her shoulders, arm, hand, and chest. Dr. Lepsch prescribed a muscle relaxant, prednisone and

tramadol to help with her symptoms. He referred her for an MRI and to Neurosurgery to find out whether there were any surgical options.

21. Dr. Lepsch told Ms. Norton that he agreed with Dr. Wagner that she should not work while her rehabilitative and treatment options were explored.

22. Around this time, Ms. Norton filed a claim for Short Term Disability benefits (the "Benefits") based on her Unum Plan through HDJ.

23. Soon after filing the claim, Ms. Norton was notified by Unum that they received her claim and they informed her they would request her recent records from her treating providers, namely Dr. Wagner and Dr. Lepsch. Unum had her sign, via electronic signature, a form authorizing Unum to request her records from these providers, whose contact information was provided by Ms. Norton. Ms. Norton reasonably relied on Unum's assurances that they would obtain Ms. Norton's records on her behalf. At no point was Ms. Norton informed that she would have to request any records herself.

24. On May 10, 2019, Unum wrote to Ms. Norton to inform her that it requested records from Drs. Lepsch and Wagner and that Unum also requested that each physician fill out an Attending Physician Statement.

25. That same day, On May 10, 2019, Dr. Lepsch completed the Attending Physician Statement and returned it to Unum. That statement included the following:

   a. Dr. Lepsch advised Ms. Norton at her last office visit on April 22, 2019 to stop working;

   b. Ms. Norton's primary diagnosis was Cervical Radiculopathy;

    c. Her treatment plan included tramadol, Flexeril, prednisone, physical therapy, x-rays, an MRI, and a neurosurgery consult;

    d. Ms. Norton was not advised to return to work;

    e. Her expected return to work date was unknown;

    f. Her current restrictions and limitations included: sitting at a desk and driving for extended periods.

26. Also on May 10, 2019, Ms. Norton had an MRI of her cervical spine which demonstrated the following:

"Findings: Mild degenerative endplate marrow signal changes are noted at C5-6 and C6-7. Vertebral body heights are preserved. There is straightening of the normal cervical lordosis with trace retrolisthesis of C5-6. Diffuse disc desiccation is present, with severe loss of disc height at C6-7.

C2-C3: There is mild facet arthropathy, without significant central spinal canal or neural foraminal stenosis.

C3-4: There is a small posterior disc osteophyte complex and mild facet arthropathy, without significant central spinal canal or neural foraminal stenosis.

C4-5: There is a small posterior disc osteophyte complex with a superimposed shallow right foraminal protrusion. Mild facet arthropathy is noted as well. There is no significant central spinal canal or neural foraminal stenosis.

C5-6: There is a moderate posterior disc osteophyte complex with moderate facet and uncovertebral degenerative changes. These findings result in mild central spinal canal stenosis and moderate bilateral neural foraminal stenosis.

C6-7: There is a small posterior disc osteophyte complex with left greater than right facet uncovertebral hypertrophy. These findings result in mild left neural foraminal stenosis. There is no significant central spinal canal or right neural foraminal stenosis.

C7-T1: There is mild facet arthropathy, without significant central spinal canal or neural foraminal stenosis."

27. Compared with the MRI from 2016, the 2019 MRI and x-ray findings demonstrate a significant worsening in Ms. Norton's spine condition over just 3 years.

28. On June 12, 2019, Unum wrote to Ms. Norton and informed her it had received a response from her providers and had written to them for further clarification.

29. On June 18, 2019, Unum received a response from Dr. Lepsch's office that the records request could not be processed with the authorization form Unum had provided.

30. Nearly three weeks later, on July 5, 2019, Unum wrote to Ms. Norton and asked that she complete an enclosed special authorization provided by Dr. Lepsch's office in order to re-request those records. Ms. Norton signed and returned the authorization immediately, which was received by Unum on July 10, 2019.

31. Six days later, on July 16, 2019, Unum re-requested medical records using the special form.

32. On July 29, 2019, Unum claims it received a copy of the request for records from Dr. Lepsch but that the records provided were "completely blank." This was obviously beyond Ms. Norton's control and Unum failed to notify her of the omission or give her any opportunity to assist in correcting it. There is no evidence in the record that Unum informed Dr. Lepsch's office of the error, much less gave them time to correct it.

33. Instead, Unum simply closed Ms. Norton's claim, writing to her on July 19, 2019 that it was denying and closing her claim because "the information requested from you and your physician was not received within the requested period."

34. Ms. Norton has appealed to Unum three times internally since.

35. In its latest Adverse Decision dated April 6, 2021, Unum admitted it received medical records from "multiple treating providers beginning May 15, 2019," which obviously contradicts its prior claim that it had received no records on July 30, 2019.

36. Unum provided no reasonable basis for its denial. Instead, its entire reasoning was based on fabrications and mischaracterizations of the evidence. The self-serving opinion of Unum and its reviewers were entirely inconsistent with the evidence and the opinions of Ms. Norton's treating providers, whose opinions carry greater weight as a matter of law.

37. For example, Unum acknowledges in its latest denial that Ms. Norton's profession requires her to sit for most of the day. Unum then determines, without any substantive basis, that Ms. Norton can tolerate a full-time, sedentary job, which is entirely inconsistent with Ms. Norton's treating providers' consistent opinions that Ms. Norton cannot tolerate a position that requires prolonged periods of sitting or working at the computer.

38. As another example, in one of its denials, Unum fraudulently asserted that "the MRI of the cervical shows ONLY age-appropriate changes with no evidence of stenosis or nerve root involvement." This is an outright

9

fabrication, as the 2019 imaging clearly shows evidence of central canal stenosis, foraminal stenosis, and changes that far exceed "age-appropriate changes."

39. Also in its latest denial, Unum cherry-picked and pulled random excerpts from Ms. Norton's records, attempting to piece them together out of context to justify its denial. Unum did not conduct a fair and unbiased investigation of Ms. Norton's claims, but only stitched together and mischaracterized a handful of positive comments in Ms. Norton's record to support its claim denial, which is the essence of bad faith.

40. In short, over the past three years, Ms. Norton has provided Unum with hundreds of pages of records substantiating her claim, including objective medical evidence demonstrating her physical disability, and statements from her treating providers that Ms. Norton is Disabled as defined by the Plan.

41. Unum's unreasonable determination that Ms. Norton did not meet the definition of "Disabled" under the Plan similarly rendered her unable to obtain the long-term disability (LTD) benefits provided by the Plan, which require an identical disability determination.

42. Ms. Norton has made every effort to mitigate the damages in this case. Ms. Norton attempted to find part-time legal jobs, but upon extensive search, found they do not exist. Therefore, Ms. Norton started her own practice, which permits her to continue practicing law while allowing her to control her work schedule and find time to take breaks for therapeutic activities, such as

chiropractic treatment, stretching, using ice or heat, or using one of her therapeutic devices, such as her traction machine or TENS unit.

43. Ms. Norton works as much as she can, but she continues to have limitations and growing a practice takes time, so she has experienced a near total diminishment in her compensation since leaving her firm-based, full-time attorney practice, and has taken on significant debt to pay her business and personal expenses, including the cost of her continuing treatment.

## RELEVANT LAW AND VIOLATIONS

44. Plaintiff incorporates paragraphs 1 through 43 as though fully set forth herein.

45. Section 502(a)(1)(B) of ERISA states, in relevant part: "A civil action may be brought by a…beneficiary…to recover benefits due to him under the terms of his plan" or "to enforce his rights under the terms of the plan…" 29 U.S.C. §1132(a)(1)(B).

46. Section 502(g)(1) of ERISA states, in relevant part: "In any action under this subchapter by a beneficiary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. §1132(g)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter an Order:

A. Declaring that Ms. Norton was Disabled and therefore entitled to short-term disability benefits under the Plan on April 21, 2019;

B. Ordering Unum to pay to Ms. Norton the amount of her past-due STD benefits under the plan from April 21, 2019 to October 21, 2019, which is $44,625.00, and enforcing all her other rights under the Plan during that time;

C. Declaring that Ms. Norton remained Disabled and was therefore entitled to long-term disability (LTD) benefits under the Plan on October 21, 2019, and that she remains Disabled and entitled to LTD benefits today;

D. Ordering Unum to pay to Ms. Norton the amount of her past-due LTD benefits under the Plan since October 21, 2019, which is $299,675.00 and enforcing Ms. Norton's rights under the Plan from October 21, 2019 to the present;

E. Ordering Unum to reimburse Ms. Norton for her legal fees and costs to enforce her rights under the Plan, including but not limited to, reasonable attorneys' fees, as authorized by 29 U.S.C. §1132(g);

F. Ordering any other appropriate equitable relief as is appropriate and just.

**BETH A. NORTON**

By: _____

/s/
Beth A. Norton, Esquire (VSB #87664)
Norton Health Law, P.C.
1441 Sachem Place, Suite 2
Charlottesville, Virginia 22901
Telephone: (434) 978-3100
Email: bnorton@nortonhealthlaw.com
*Counsel for Plaintiff/Pro Se*

CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2022, a true and accurate copy of this pleading was mailed, first class, postage prepaid to:

> Corporation Service Company
> Registered Agent of Unum Life Insurance Company of America
> 100 Shockoe Slip, Floor 2
> Richmond, VA, 23219-4100
> (*Registered Agent for Defendant*)

Secretary, U.S. Department of Labor

200 Constitution Ave NW
Washington, DC 20210

/s/ [signature]